**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

-------------------------------------------------------------------X

**MADISON MATTHEWS,**

                                                       Civil Action No.

                        **Plaintiff,**

        v.

**GUCCI; GUCCI AMERICA INC; GUCCI NORTH**         **COMPLAINT**
**AMERICAN HOLDINGS; KERING; GREGORY**
**WRIGHT (in his individual and official capacity); JAMES**
**TAYLOR (in his individual and official capacity);**
**JESSICA BUQUICCHIO (in her individual and official**
**capacity); AND (JESSICA SANTI-WELLS (in her**
**individual and official capacity).**

                           **Defendants.**
-------------------------------------------------------------------X

Plaintiff, Madison Matthews, as and for her Complaint against Defendants respectfully states

upon information and belief as follows:

## **NATURE OF THE CASE**

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C.

   §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L.

   No. 102-166 ("Title VII")); the Pennsylvania Human Relations Act, as amended, 43 P.S. §§

   951, *et. seq.* ("PHRA"); Americans with Disabilities Act of 1990 (Pub. L. 101-336) (*ADA*),

   and Title 29 of the Family and Medical Leave Act of 1993; and seeks  damages to redress

   injuries Plaintiff suffered as a result of discrimination and retaliation.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

2.  Around February 11, 2020, Plaintiff timely filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

3.  Plaintiff by and through her attorney requested that her Charge be simultaneously filed with the PHRC and the Philadelphia Commission on Human Relations and the Upper Merion Township Human Relations Commission.

4.  The continuing acts of employment discrimination reference in Plaintiff's charges of discrimination were committed by the following parties: (1) Gucci America Inc.; (2) Gucci; (3) Gucci North American Holdings; (4) Kering; (5) Gregory Wright; (6) James Taylor; (7) Jessica Buquicchio; and (8) Jessica Santi-Wells.

5.  Around August 5, 2020, the EEOC issued Plaintiff a Notice of Right to Sue.

6.  This action was being commenced within ninety (90) days of Plaintiff receiving the Notice of Right to Sue.

7.  Plaintiff has complied with all administrative prerequisites to bring this lawsuit.

8.  Plaintiff's PHRA claims are still pending before the PHRC because less than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's Charge.

9.  Plaintiff will seek leave to amend this complaint to assert her PHRA claims against the parties referenced in ¶ 26 above. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## PARTIES

12.     Plaintiff Madison Matthews (hereinafter referred to as "Plaintiff") is an individual transgender female who is perceived to have a disability.

13.     Plaintiff, at all relevant times, was a resident of the Commonwealth of Pennsylvania.

14.     At all times material, Gucci America, Inc. is a foreign for-profit corporation headquartered at 50 Hartz Way, Secaucus, NJ 07094.

15.     At all times material, Gucci is a foreign for-profit corporation.

16.     At all times material, Gucci North American Holdings, Inc. is a foreign for-profit corporation.

17.     At all times material, Kering. is a foreign for-profit corporation.

18.     The above Defendants will collectively be referred to hereinafter as "Defendant Gucci."

19.     At all times material, Defendant Gregory Wright (hereinafter referred to as "Defendant Wright") was and upon information and belief remains an employee of Defendant Gucci, as a Store Director of the King of Prussia Gucci Boutique.

20.     At all times material, Defendant Wright held supervisory authority over Plaintiff.

21.     At all times material, Defendant James Taylor (hereinafter referred to as "Defendant Taylor") was and upon information and belief remains an employee of Defendant Gucci, as a Client Advisor.

22.     At all times material, Defendant Taylor held supervisory authority over Plaintiff.

23.     At all times material, Jessica Santi-Wells (hereinafter referred to as "Defendant Santi"), was  and upon information and belief remains an employee of Defendant Gucci, the King of Prussia  boutique's assistant manager.

24.     At all times material, Defendant Santi held supervisory authority over Plaintiff.

25.     At all times material, Jessica Buquicchio (hereinafter referred to as "Defendant Buquicchio"), was and upon information and belief remains an employee of Defendant Gucci, the King of Prussia as a Human Resources Manager.

26.     At all times material, Defendant Buquicchio held supervisory authority over Plaintiff.

27.     At all times material, Defendant Gucci, Defendant Wright, Defendant Santi, Defendant Buquicchio and Defendant Taylor were the  joint employers of Plaintiff.

## **MATERIAL FACTS**

24.     Around April 2019, Plaintiff was hired as a Connection Coordinator by Defendant Gucci.

25.     At all times relevant Plaintiff performed her role as Connection Coordinator successfully.

26.     Upon information and belief, around June of 2019, Plaintiff asked Defendant Wright if she could walk in a fashion show for Pride in Philadelphia with other Transgender models.

27.     Defendant Wright asked Plaintiff why she was walking in an all Transgender show.

28.     Plaintiff informed Defendant Wright that she was transgender.

29.     Defendant Wright replied, "[o]h! I had no idea. But someone did ask me if you were 'transgender' and I said no, not that I'm aware of."

30.     Plaintiff inquired as to who made the statement about her gender.

31.     Defendant Wright refused to provide any information about who made the statement.

32.     Defendant Wright did, however, allege that he had reported the comment to HR.

33.     Plaintiff followed up with Defendant Buquicchio of HR approximately one week later to ensure that a complaint had been filed.

34.     Defendant Buquicchio informed Plaintiff that Defendant Wright had never spoken with her regarding any statements made concerning Plaintiff's gender.

4

35.     Defendant Wright's comments made Plaintiff felt uncomfortable.

36.     Almost immediately thereafter Plaintiff was subjected to a hostile work environment saturated with sex/gender discrimination and sexual harassment.

37.     By way of example and by no means an exhaustive list, employees frequently and intentionally misgendered Plaintiff, calling her "little bro" and other names commonly associated with the male gender.

38.     By way of further example, Plaintiff noticed her male co-worker moving away from her or backing up when she would walk by.

39.     Upon information and belief, they were doing so to provide her room for her presumed male appendage and out of discomfort due to her transgender status.

40.     By way of further example, after inadvertently scheduled Plaintiff for three days off in one workweek, Defendant Wright took a personal day from the Plaintiff.

41.     Upon information and belief, Defendant Wright did not similarly deduct personal days from other employees' balances when Defendant Wright made scheduling errors.

42.     The gender identity and sex discrimination were primarily perpetrated by two supervisors: Defendant Wright and Defendant Taylor.

43.     The harassment and discrimination occurred on an almost daily basis.

44.     Plaintiff was also harassed on the basis of her perceived disability.

45.     Plaintiff was mocked because her coworkers perceived her as having, "mental issues," and/or being "bi-polar."

46.     By way of example, and by no means an exhaustive list, on at least on occasion a coworker stated to Plaintiff, "you are fucking bipolar."

47.     This harassment was perpetrated and witnessed by managers.

48.     By way of example, Defendant Wright on numerous occasions called Plaintiff, "fucking crazy."

49.     By way of further example, Defendant Santi stated, "here comes crazy," and called Plaintiff, "**MAD**ison."

50.     August 2019, Plaintiff's coworker Kristen MacDonald (hereinafter "Ms. MacDonald") resigned from her position with Defendant Gucci.

51.     Upon information and belief, Ms. MacDonald resigned due to the hostile work environment.

52.     Upon information and belief this hostile work environment included Ms. MacDonald witness Defendant Wright refuse to assist Asian customers or work with Asian employees.

53.     By way of further example, upon information and belief, Ms. MacDonald observed Defendant Wright discriminate against Hispanic customers and employees.

54.     By way of further example, upon information and belief, on one occasion Defendant Wright stated to Ms. MacDonald, "I hired you to deal with all the 'white mainline bitches.'"

55.     On another occasion, upon information and belief, Defendant Wright stated to Ms. MacDonald, "I heard that [Plaintiff] was born a man." Defendant Wright and Ms. MacDonald were not discussing Plaintiff at the time.

56.     Upon information and belief, Ms. MacDonald witnessed Defendant Wright tell female subordinate employees things like, "you should flirt with customers," and he would, "bash her face in."

57.     Ms. MacDonald, upon information and belief observed Defendant Wright, on numerous occasions refer to subordinate female employees, including Plaintiff, as "fucking crazy."

58.     On at least one occasion, upon information and belief, Defendant Wright confiscated the personal phone of a Defendant Gucci employee containing pictures of a sexual nature and showed other

6

Defendant Gucci employees including Plaintiff, Ms. MacDonald, and other subordinate female employees.

59.     Upon  information and  belief,  this was not the  only time Defendant Wright showed Defendant Gucci employees pictures of a sexual nature.

60.     Upon information and belief, during her exit interview, Ms. MacDonald, reported the above discriminatory and unlawful acts to Human Resources (hereinafter "HR").

61.     Upon  information and  belief, Ms.  MacDonald  also reported  that she had  witnessed Defendant James, refer to Plaintiff, on numerous occasions as "lil' bro".

62.     Furthermore,  Ms.  MacDonald  reported  that  she  had  witnessed  Plaintiff  approach Defendant  Wright  about  Defendant  James'  discriminatory  and  unlawful  conduct  and  that Defendant  Wright refused to address the unwanted comments and conduct with Defendant James.

63.     Upon information and belief, Ms. MacDonald informed HR that many Defendant Gucci employees were not comfortable going to HR while still employed because they feared retaliation by Defendant Wright.

64.     After Ms. MacDonald resigned the harassment and discrimination intensified.

65.     Defendant Taylor, Ayumi Perry (hereinafter referred to as "Ms. Perry") and Leia Delgado (hereinafter referred to as "Ms. Delgado") all participated in the discrimination of Plaintiff by making salacious accusations about Plaintiff, her personal life, her mental health and her gender identity.

66.     By way of example, and by no means an exhaustive list, Defendant Taylor, Ms. Perry, and Ms. Delgado referred to Plaintiff on numerous occasions as "crazy," "bipolar" "MADison" and "Bruce."

67. Around September 2, 2019, a verbal disagreement occurred between Ms. Delgado, Ms. Perry, Janayah Sacks (hereinafter referred to as "Ms. Sacks"), and Plaintiff.

68. Ms. Delgado's anger quickly increased to the point that she was throwing objects.

69. During her outburst, Ms. Delgado called Plaintiff of being, "unstable" and "bipolar."

70. Ms. Delgado's went to Defendant Wright's office where she continued to discuss the verbal disagreement in a very heated manner.

71. After his discussion with Ms. Delgado, Defendant Wright approached Plaintiff and stated, "I want to see you drag Leia [Delgado] by her hair through the parking lot."

72. Plaintiff, uncomfortable with Defendant Wright's comments stated, "you are sick."

73. Around, September 7, 2019, Defendant Wright called Plaintiff into his office with Ms. Delgado.

74. There, in Defendant Wright's presence, Ms.  Delgado called Plaintiff "bipolar" and "unstable."

75. Defendant Wright's response was, "[e]ither work it out or go fight each other in the parking lot." Defendant Wright further stated, "I'd rather see you fight," which he followed with laughter.

76. In the days and weeks following that meeting Ms. Delgado continued to tell Plaintiff's coworkers that Plaintiff was bipolar, crazy, and unstable.

77. As Plaintiff was gathering her belongings to leave for the day Defendant Wright approached her and asked if she could confirm that a rumor was being spread.

78. Defendant Wright proceeded to ask Plaintiff if she had heard about him and Shawn McAllister having sexual relations.

79. Plaintiff informed Defendant Wright that she was, "uncomfortable." Plaintiff further informed Defendant Wright that she wanted to leave.

80.     Defendant Wright did not let up. He pressed Plaintiff and asked her, "did you hear this rumor."

81.     Upon information and belief, Defendant Wright was asking about the rumors about his sexual relationship with Sean McAllister.

82.     Plaintiff I replied "yes."

83.     Defendant Wright asked who had told Plaintiff.

84.     Plaintiff replied, "Leia Delgado."

85.     Defendant Wright continued to interrogate Plaintiff and asked, "who did you tell?"

86.     Plaintiff was honest and told Defendant Wright that she had asked Ms. Saks, a client advisor, if the rumors were true.

87.     Plaintiff was uneasy and upset by Defendant Wright's tone and accusation.

88.     Upon information and belief, the rumors began around August 2019 after Ms. Delgado had observed Defendant Wright and Shawn McAllister, the operations manager, romantically embracing in the  back halls of the mall.

89.     Shortly after Defendant Wright's interrogation of Plaintiff, Ms. Saks called Plaintiff, and stated, "just so you know they are all down here saying that you are spreading the rumor about [Defendant Wright] and [Shawn McAllister]."

90.     Around September 13, 2019, Plaintiff sent Defendant Wright a text message and asked if he had time to talk about Defendant Wright's comments and conduct in regard to Plaintiff and the Shawn McAllister rumors.

91.     Defendant Wright called Plaintiff from the Defendant Gucci's King of Prussia boutique.

92.     Plaintiff informed Defendant Wright that she was not comfortable with him bringing up his sexual relationship.

93.     Defendant Wright informed Plaintiff that he would call her back when Defendant Santi, the boutique's assistant manager, came in.

94.     Approximately one hour later, Defendant Wright and Defendant Santi called Plaintiff.

95.     Defendant Wright immediately accused Plaintiff of starting the "rumor," that he was sleeping with Shawn McAllister.

96.     Plaintiff reiterated that she had not.

97.     Defendant Wright informed Plaintiff he was, "going to a manager's training out of town," and would "deal with" her when he got back.

98.     Plaintiff was extremely distraught and embarrassed.

99.     Around, September 16, 2019, Plaintiff, as a result of Defendant Wright's unlawful conduct, had a horrible panic attack while driving to work and had to call out.

100.    Around September 17, 2019, Plaintiff returned to work.

101.    Plaintiff's coworkers and supervisors made continuous comments, jokes and whisperings making work unbearable.

102.    The intimidating conduct such as whispering about Plaintiff and ostracizing her exacerbated Plaintiff's anxiety.

103.    Around Wednesday September 18, 2019, Plaintiff's coworker Ms. Perry sent a mass text to coworkers stating "[s]omeone left credit card info on the desk."

104.    Upon information and belief, Ms. Perry did this to get Plaintiff terminated in retaliation for Plaintiff's opposition to the discriminatory and unlawful treatment.

105.    Around September 20, 2019, Plaintiff was told by a fellow employee that she should, "leave the business."

106.    Plaintiff's coworkers and supervisors continued to refer to her as, "lil bro," "mccrazy," "bipolar," and "Bruce."

107.    Upon information and belief, the name Bruce was used to compare Plaintiff to Kaitlyn Jenner AKA Bruce Jenner, a transgender celebrity.

108.    Later that day, Plaintiff was getting ready to take her lunch break.

109.    Defendant Wright approached Plaintiff and told her that she, "no longer get[s] the advantage of taking [her] lunch whenever [she] want[s]."

110.    Furthermore, Defendant Wright instructed Plaintiff to go back to her desk and did not permit her to take lunch.

111.    Plaintiff's therapist, Cheryl Wilson (hereinafter "C. Wilson") recommended and instructed Plaintiff to call the Human Resources Department to tell them she was in no state to return to work.

112.    Around September of 2019, Plaintiff reported the discriminatory harassment to Defendant Gucci's HR department via email.

113.    Approximately 10 days after reporting the discriminatory behavior, Plaintiff called out sick due to the emotionally distressing toll it had taken on her .

114.    Defendant Buquicchio subsequently called Plaintiff and informed Plaintiff that she was  running out of leave and she would need to consider taking a leave of absence.

115.    Plaintiff was ultimately forced to take unpaid FMLA leave to preserve her health while securing her employment with Defendants.

116.    Plaintiff requested and was granted FMLA leave from September 30, 2019 until October 31, 2019.

117.    Ms. Keraka Wong (hereinafter "Ms. Wong") became a contact person between and along with Gucci Human Resources Department.

118.   Ms. Wong is a Total Reward Analyst from Kering.

119.   Ms. Wong continuously referred to Plaintiff as "him".

120.   Plaintiff corrected Ms. Wong after the first time.

121.   Ms. Wong continued to refer to Plaintiff as "him" and in one instance, Ms. Wong did so while Plaintiff was on speakerphone in her husband's presence. and was able to hear it.

122.   On one occasion, Plaintiff was in C. Wilson's office.

123.   Plaintiff had Ms. Wong on speakerphone and C. Wilson was able to hear Ms. Wong refer to Plaintiff as "him."

124.   C. Wilson told Plaintiff to end the phone call.

125.   Around November 2019, Plaintiff, concerned that Defendant Gucci would be shorthanded due to the holiday season and beginning to feel mentally ready to attempt to return to work, Plaintiff reached out to Defendant Buquicchio to inform her of her return.

126.   Defendant Buquicchio informed Plaintiff that they were in need of the required paperwork for Plaintiff's return due to their weeks without communication with each other.

127.   Plaintiff contacted Hartford who notified Plaintiff that Defendant Gucci would not be signing Plaintiff's necessary FMLA paperwork for her return.

128.   Finally, at the end of December and following the holiday season, Defendant Gucci approved Plaintiff's return to work.

129.   Plaintiff was approved for her return to work for January 2, 2020.

130.   A meeting with Plaintiff's supervisor occurred after Plaintiff's return date was selected.

131.   During this meeting, Plaintiff had a panic attack and had to have her husband pick her up.

132.   Following Plaintiff's return from FMLA leave, Plaintiff was told by her supervisor that he had plans to frame her for stealing.

133.    When Plaintiff returned s FMLA the persistent harassment continued, and she was informed of the plan to frame her for stealing which would inevitably end up with Plaintiff being terminated.

134.    Around February 6, 2020, Plaintiff lodged a formal complaint via email and to the head of HR, Defendant Buquicchio resulting in the scheduling of a meeting.

135.    On February 11, 2020, Plaintiff filed a Charge with the EEOC.

136.    In March 2020 Plaintiff was forced to take another leave of absence and returned from that leave in June 2020.

137.    Since filing her complaints of discrimination, and sexually explicit and verbally- and  physically- harassing conduct, Plaintiff's position was modified.

138.    In her new position, Plaintiff was informed she would receive a bonus.

139.    Around September 2020, Defendants informed Plaintiff that her position was not one that received bonuses.

140.    Plaintiff produced the paperwork she received when her position was changed.

141.    Plaintiff's paperwork clearly indicated that she was entitled to a bonus.

142.    Plaintiff did receive part of the pay she was entitled to.

143.    However, Defendants have failed to pay Plaintiff for at least one month's bonus.

144.    Upon information and belief, this was retaliation for her opposition to the unlawful conduct of Defendants and for her lawful use of FMLA leave.

145.    The above are just some examples, of some of the discrimination and retaliation to which Defendants subjected Plaintiff to on a continuous and on-going basis throughout Plaintiff's employment.

146.    As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

147.   As a result of Defendants' conduct and comments, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

148.   Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition.

149.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails.   Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

150.   Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

151.   Plaintiff claims that Defendants' unlawfully discriminated against her because of her sex, a perceived disability, and retaliated against her because she opposed the unlawful conduct of Defendants related to the above protected class.

152.   Plaintiff further claims constructive discharge to the extent that Plaintiff was forced to resign from Plaintiff's position as a result of the unlawful discrimination and retaliation.

153.   Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

154.   The Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

155.   Plaintiff claims alternatively that Plaintiff was an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendant owed and

breached its duty to Plaintiff to prevent the harassment, discrimination, and retaliation and is liable therefore for negligence.

### FIRST CAUSE OF ACTION
### <u>DISCRIMINATION UNDER TITLE VII</u>
**(against Corporate Defendants only)**

156.    Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

157.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

158.    SEC. 2000e-2. *[Section 703]* states as follows:

(a)  Employer practices

It shall be an unlawful employment practice for an employer –

(1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

159.    Title VII further provides that "unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

160.    Defendants engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiffs with respect to her compensation, terms, conditions, training and privileges of employment because of her sex/gender and/or sexual orientation.

161.    Defendants subjected Plaintiff to adverse tangible employment actions—defined as significant changes in Plaintiff's employment status, discipline, reassignment with significantly different job responsibilities, withholding of bonuses and decisions causing significant changes in her employment.

162.    Plaintiff's protected characteristics (sex/gender and/or sexual orientation) was a determinative factor in the Defendants' decisions.

163.    Defendants cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by Defendants for their actions against Plaintiff are pretextual and can readily be disbelieved.

164.    Alternatively, Plaintiff's protected status played a motivating part in the Defendants' decisions even if other factors may also have motivated its actions against Plaintiff.

165.    Defendants acted with the intent to discriminate.

166.    Defendants acted upon a continuing course of conduct.

167.    As a result of the Defendants' violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**SECOND CAUSE OF ACTION**
<u>**TITLE VII HOSTILE WORK ENVIRONMENT**</u>
**(against Corporate Defendants only)**

168.    Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

169.    Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment. <u>Harris v. Forklift Systems</u>, 510 U.S. 17, 21 (1993).

170.    An employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998).

171.    Respondeat superior liability for the acts of non-supervisory employees exists where "the defendant knew or should have known of the harassment and failed to take prompt remedial action. <u>Andrews v. city of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990).

172.    Employer liability for co-worker harassment also exists where "the employer failed to provide a reasonable avenue for complaint." <u>Huston v. Procter & Gamble Paper Prods. Corp.</u>, 568 F.3d 100, 105 (3d Cir. 2009).

173.    The Third Circuit has held that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." <u>Jensen v. Potter</u>, 435 F.3d 444, 446 (3d Cir. 2006).

174.    Here, Defendants' conduct occurred because of Plaintiff's legally protected characteristics and was severe or pervasive enough to make a reasonable person of the same legally protected classes believe that the conditions of employment were altered and that the working environment was intimidating, hostile, or abusive.

175.    Plaintiff's supervisors had the authority to control Plaintiff's work environment, and they abused that authority to create a hostile work environment.

176.    Sexually explicit and verbally- and physically- harassing conduct filled the environment of Plaintiff's work area.

177.    Defendants knew that the sexually explicit and verbally- and physically- harassing conduct filled Plaintiff's work environment.

178.    Sexually explicit verbally- and physically- harassing conduct occurred on an almost if not daily basis.

179.    Sexually explicit verbally- and physically- harassing conduct caused Plaintiff to sustain severe emotional distress resulting in physical illness.

180.    Plaintiff subjectively regarded the sexually explicit verbally- and physically- harassing conduct as unwelcome and unwanted and objectively opposed the conduct.

181.    The conduct was both severe and pervasive.

182.    The conduct was emotionally damaging and humiliating.

183.    The conduct unreasonably interfered with Plaintiff's work performance.

184.    The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

185.    The Defendants provided a futile avenue for complaint.

186.    They Defendants acted upon a continuing course of conduct.

187.   As a result of the Defendants' violations of Title VII, Plaintiff has suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

### THIRD CAUSE OF ACTION
### RETALIATION UNDER TITLE VII
### (against Corporate Defendants only)

188.   Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-m e n t i o n e d  paragraphs as fully as if they were set forth at length.

189.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer:  "(1) to…discriminate against any of his employees…because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this subchapter."

141.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e *et seq.* by retaliating against Plaintiff with respect to the terms, conditions, and/or privileges of his employment because of his opposition to and reporting of the unlawful employment practices of Defendants.

### FOURTH CAUSE OF ACTION
### DISCRIMINATION UNDER STATE LAW
### (against all Defendants)

190.   Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-m e n t i o n e d  paragraphs as fully as if they were set forth at length.

191.    Plaintiff's PHRA claims are still pending before the PHRC because less than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's Charge.

192.    Plaintiff will seek leave to amend this complaint to assert her PHRA claims against the parties referenced in ¶ 26 above. <u>See</u> Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleasing), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

**FIFTH CAUSE OF ACTION**
**<u>RETALIATION UNDER STATE LAW</u>**
**(against all Defendants)**

193.    Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

194.    Plaintiff's PHRA claims are still pending before the PHRC because less than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's Charge.

195.    Plaintiff will seek leave to amend this complaint to assert her PHRA claims against the parties referenced in ¶ 26 above. <u>See</u> Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleasing), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

**SIXTH CAUSE OF ACTION**
**AIDING AND ABETTING**
**UNDER STATE LAW**
**(against all Defendants)**

196.    Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

197.    Plaintiff's PHRA claims are still pending before the PHRC because less than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's Charge.

198.    Plaintiff will seek leave to amend this complaint to assert her PHRA claims against the parties referenced in ¶ 26 above. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleasing), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

**SEVENTH CAUSE OF ACTION**
**DISCRIMINAITON**
**UNDER THE AMERICANS WITH DISABILITIES ACT**
**(against Corporate Defendants)**

199.    Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

200.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

201.    Plaintiff claims Defendant violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (*ADA*), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

202.    Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall

discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

203.    To determine whether an individual is disabled under the ADA, the statute "shall be construed in favor of broad coverage of individuals . . . to the maximum extent" permitted by law. 42 U.S.C. § 12102(4)(A).

204.    A "disability" is defined by the ADA as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id*. § 12102(1)(A)–(C). Albright's Complaint only alleges that his clinical depression and anxiety disorders constitute a physical or mental impairment that substantially limits a major life activity. (Compl. ¶ 12; Oct. 10, 2019 Hr'g Tr. 49:22–50:5.)

205.    Defendant engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of a perceived disability – namely that he was treated less favorably than other similarly situated employees who were not disabled.

206.    Plaintiff has been damaged as set forth herein.

**EIGHTH CAUSE OF ACTION**
**RETALIATION**
**<u>UNDER THE AMERICANS WITH DISABILITES ACT</u>**
**(against individual Defendants)**

207.    Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

208.    SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this

chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

209.   Plaintiff opposed Defendants' unlawful acts and practices and was retaliated against as set forth herein.

210.   Plaintiff has been damaged as set forth herein.

**NINTH CAUSE OF ACTION**
**INTERFERENCE AND RETALIATION**
**UNDER THE FAMILY MEDICAL LEAVE**
**ACT**
**(against individual Defendants)**

211.   Plaintiff, Madison Matthews, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

212.   Title 29 of the Family and Medical Leave Act of 1993, Chapter 28, Subchapter I, § 2615 states as follows: "Prohibited Acts: (a) Interference with Rights (1) Exercise of Rights: It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise and right provided under this subchapter. (2) Discrimination: It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

213.   Defendants interfered with Plaintiff's rights under the above section and discriminated against Plaintiff for opposing Defendants' unlawful employment practice and exercising her rights.

214.   Defendants violated the FMLA by interfering with, restraining and/or denying Plaintiff's rights under the FMLA, including, but not limited to, by:

    a)  Failing to comply with the general notice requirements under the FMLA;

    b)  Failing to comply with the eligibility notice requirements under the FMLA;

    c)  Failing to comply with the rights and responsibilities notice requirements under the

23

FMLA;

d) Failing to comply with the designation notice requirements under the FMLA;

e) Failing to provide notice of a fitness-for-duty certification with the designation notice as required by the FMLA;

f) Failing to continue to contribute to Plaintiff's health benefits while she was placed on involuntary medical leave;

g) Discharging and/or constructively discharging, suspending and/or disciplining Plaintiff notwithstanding that Plaintiff was fit to perform her duties;

h) Retaliating against Plaintiff for asking for a reasonable accommodation and/or leave to attend her doctor's appointment.

i) In the alternative, forcing Plaintiff to go into involuntary, full-time medical leave;

j) Failing to provide Plaintiff with the proper FMLA forms and/or medical certifications;

k) Failing to supervise and/or train its employees and supervisors on compliance with the provisions of the FMLA;

l) Upon information and belief, failing to have an audit of Defendant's FMLA policies, procedures and compliance at its branch offices.

m) Otherwise violating the FMLA.

215. Defendants' violations of the FMLA were grossly negligent and/or willful.

216. As a direct and proximate cause of Defendants violation of the FMLA, Defendants are liable for Plaintiff's compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of their violation, and for appropriate equitable or other relief tailored to the harm suffered by Plaintiff. See 29 CFR 825.300 (e).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Matthews demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress, back pay and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.


Dated:  Philadelphia, Pennsylvania          **DEREK SMITH LAW GROUP, PLLC**

       January 29, 2021                              *Attorneys for Plaintiff Matthews*


By: _/s/ Catherine W. Smith, Esq._____
    Catherine W Smith, Esquire
    1835 Market Street, Suite 2950
    Philadelphia, Pennsylvania 19103
    (215) 391-4790
    catherine@dereksmithlaw.com