**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MADISON MATTHEWS**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 21-434-KSM** |
| **GUCCI, et al.**, | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                   **February 15, 2022**

Plaintiff Madison Matthews brings this employment discrimination suit against Corporate Defendants Gucci, Gucci America Inc., Gucci North American Holdings, and Kering,[1] and against Gregory Wright, James Taylor, Jessica Buquicchio, and Jessica Santi-Wells, in their official and individual capacities.  (Doc. No. 1.)  Matthews, a transgender female, alleges that Defendants discriminated against and harassed her on the basis of her sex and gender identity and perceived disability.  (*Id.*)  She asserts claims against the Corporate Defendants under Title VII of the Civil Rights Act of 1964 ("Title VII") (Counts 1–3), claims against the Individual Defendants under the Family and Medical Leave Act ("FMLA") (Count 9), and claims against all Defendants under state law (Counts 4–6) and the Americans with Disabilities Act ("ADA") (Counts 7–8).  (*See id.* at pp. 15–24.)

Defendants Gucci America, Inc. ("Gucci") and Kering Americas, Inc. ("Kering") (hereinafter referred to as "Defendants") moved to compel Matthews to arbitrate her claims,

---

[1] Defendants represent that Matthews wrongly identified "Kering" as a Defendant and that the company's official name is Kering Americas, Inc.  (*See, e.g.*, Doc. No. 12; Doc. No. 12-2 at ¶ 1.)

arguing that Matthews received, executed, and did not opt out of a Mutual Arbitration Agreement ("MAA").  (Doc. No. 12-1.)  Defendants also moved for sanctions under 28 U.S.C. § 1927, arguing that Matthews's counsel acted in bad faith, needlessly multiplied proceedings, and set forth frivolous and wholly unsupported arguments.  (Doc. No. 12-1 at pp. 16–18; Doc. No. 16 at pp. 13–14.)  Matthews opposes the Motion to Compel Arbitration, contending that the MAA is unenforceable.  (Doc. No. 14.)  Matthews mounts a number of challenges to the MAA's validity, including:  she did not assent to the agreement and questions the authenticity of her signature; the agreement lacks consideration; the agreement is procedurally and substantively unconscionable; and her claims do not fall within the scope of the agreement.  (*See generally id.*) Matthews also opposes the Motion for Sanctions.  (*Id.*)

For the reasons discussed below, the Court grants Defendants' Motion to Compel Arbitration, but denies the Motion for Sanctions.

## I.    Factual Background

### A.  The Mutual Arbitration Agreement

On March 25, 2019—about a week before her employment with Gucci commenced— Matthews executed via an electronic platform various "new hire" paperwork, including the MAA, a salary direct deposit form, Gucci's Security Standards policy, a 401(k) Automatic Enrollment Acknowledgment, the Employee Handbook Acknowledgment, an emergency contact form, a Form 1-F, and a Confidentiality and Non-Solicitation Agreement.  (Doc. No. 12-2 at ¶ 2; Doc. No. 12-4; Doc. No. 12-3 at p. 6 (Matthews's electronic signature).)

The MAA provides:

> Employee and the Company both agree all legal disputes and claims between them, including without limitation those relating to Employee's employment with the Company or any separation therefrom, and claims by Employee against the Company's parents, subsidiaries, affiliates, directors,

employees, or agents, shall be determined exclusively by final and binding arbitration before a single, neutral arbitrator as described therein. Arbitration is the submission of disputes to an impartial individual, rather than a judge or jury for final and binding determination. Except as provided below, Employee and the Company voluntarily waive all rights to trial in court before a judge or jury on all legal claims between them.

(Doc. No. 12-3 at ¶ 1.)

The MAA also states that the Employee "knowingly and voluntarily waive[s] the right to file, or participate or obtain relief in, a court action of any nature seeking money damages or injunctive relief against the Company, except as described above." (*Id.* at ¶ 3.) In turn, the MAA outlines the limited exceptions to mandatory arbitration, which include, *inter alia*, "an action by either party seeking a provisional remedy in any court of competent jurisdiction." (*Id.* at ¶ 2.)

Gucci employees may opt out of the MAA. (*See, e.g.*, Doc. No. 12-3 at p. 2 (cover sheet to the MAA, which states, "The decision whether to sign the MAA or opt of it, pursuant to the opt-out process outlined in the MAA, is a voluntary decision to be made by you"); *id.* at ¶ 10 ("Employee may opt-out of this Agreement.").) Employees are given 30 days to either sign the MAA or follow the opt-out process. (*See id.* at p. 2 ("You will have 30 days to review [the MAA] and **choose one of the following options**: 1. Sign and return the M[A]A to your Store Manager within 30 days of the date that the MAA was provided to you; or 2. Opt-out of the MAA pursuant to the opt-out process contained in the MAA."); *id.* at ¶ 10.)

The MAA also outlines the process by which employees may opt out of the Agreement. (*id.* at ¶ 10.) To opt out, the employee must request an Opt-Out Form from Opt-out@us.gucci.com. (*Id.*) "The Opt-Out Form will be provided to Employee by e-mail, and Employee must complete, sign, and send the Opt-Out Form back to Opt-out@us.gucci.com within 30 dates of the date [the MAA] is provided to Employee." (*Id.*) Significantly, if the

employee fails to follow the opt out process in a timely manner but "accepts or continues employment with the Company," she is deemed to be bound by the MAA and to have accepted its terms.  (*Id.* ("If Employee does not send the signed form within 30 days, and if Employee accepts or continues employment with the Company after that date, he or she shall be deemed to have accepted the terms of this Agreement.").)

On the cover page of the MAA, Gucci provides a list of eight company officials and their direct dial phone numbers, so the employee can contact the appropriate individuals in the event that she has any questions about the MAA or the opt-out process prior to signing the agreement. (Doc. No. 12-3 at p. 2.)

### B.  Procedural History

In September 2020, Matthews's counsel reached out to Gucci's counsel, threatening a lawsuit and making a demand; in turn, Gucci's counsel informed Matthews's counsel that Matthews had agreed to be bound by the MAA.  (*See* Doc. No. 12-4 at pp. 3–4.)  Matthews's counsel stated that her client "ha[d] reason to question the authenticity of that electronic signature" and asked for further information to authenticate her client's "purported" signature. (*Id.* at p. 3.)  Gucci's counsel responded that Gucci's records show that Matthews electronically signed the MAA at the same time that she completed and/or acknowledged eleven other new hire documents, including her direct deposit form.  (*Id.* at p. 2.)

Notwithstanding the fact that she questioned the authenticity of the e-signature, instead of filing a complaint in federal court, Matthews chose to proceed with arbitration.  On November 3, 2020, Matthews filed a demand for arbitration with the American Arbitration Association ("AAA") in Philadelphia, Pennsylvania.  (Doc. No. 12-5.)  In her demand, Matthews asserted the same statutory claims contained in instant the complaint, specifically claims for discrimination,

retaliation, and hostile work environment under Title VII (Counts 1–3); claims for discrimination, retaliation, aiding and abetting, intentional infliction of emotional distress, and negligent infliction of emotional distress under Pennsylvania state law (Counts 4–8); claims for discrimination and retaliation under the ADA (Counts 9–10); and a claim for interference and retaliation under the FMLA (Count 11). (*Id.*)

Despite having initiated the arbitration action by filing the demand, Matthews never paid the filing fee,[2] and as a result, on December 15, 2020, the AAA notified counsel that it had dismissed the action. (*See* Doc. No. 12-6 ("On November 13 and December 7, 2020, Claimant was notified that the filing requirements for the above matter have not been met. As of this date, we have not received the requested filing fee. Accordingly, we have administratively closed our file without prejudice.").)[3]

On January 29, 2021, Matthews simultaneously filed in this Court her Complaint (Doc. No. 1) and a Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. 2). On February 3, 2021, the Court held a telephonic conference to discuss Matthews's motion for a temporary restraining order and preliminary injunction, after which Mathews voluntarily withdrew her motion. (Doc. No. 7.)

Shortly thereafter, Defendants filed the instant Motion to Compel Arbitration and for Sanctions pursuant to 28 U.S.C. § 1927. (Doc. Nos. 12, 16.) Matthews opposes the motions.

---

[2] Under the terms of the MAA, because Matthews was the complainant and filed the demand of arbitration, she was responsible for paying the filing fee. (*See* Doc. No. 12-3 at ¶ 8 ("The Company shall pay all costs unique to arbitration . . . , including the regular and customary arbitration fees and expenses. However, if Employee is the party initiating the claim, Employee shall be responsible for contributing an amount equal to the filing fee to initiate the claim[.]").)

[3] Around this same time, the parties agreed to private mediation. (*See, e.g.*, Doc. No. 14-1, Ex. E.) During oral argument, counsel explained that Matthews did not pay the arbitration filing fee because they were proceeding to private mediation and there was no need to duplicate costs.

(Doc. No. 14.)

## II.   Standard of Review

When deciding a motion to compel arbitration, a court must first determine the applicable standard of review:  the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or the summary judgment standard under Federal Rule of Civil Procedure 56.  *See Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017); *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 772 (3d Cir. 2013).     "When it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti*, 716 F.3d at 776.  On the other hand, "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability," after which the court should consider the motion under the Rule 56 summary judgment standard.  *Id.*  "In the event that summary judgment is not warranted because the party opposing arbitration can demonstrate . . . that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as Section 4 of the FAA envisions."  *Id.* (cleaned up).

In their briefs, both parties argued that the summary judgment standard applies.  (*See* Doc. No. 12-1 at p. 12; Doc. No. 14 at pp. 6–7.)  During oral argument, Defendants changed course and asserted that the Rule 12(b)(6) standard applies while Matthews continued to maintain that the Rule 56 standard applies.

Here, the Court concludes that the Rule 12(b)(6) standard governs because Defendants attached the MAA to their Motion to Compel Arbitration and Matthews failed to respond with additional facts sufficient to place the MAA at issue.  *See Parker v. Briad Wenco, LLC*, Civil Action No. 18-04860, 2019 WL 2521537, at *2 (E.D. Pa. May 14, 2019) ("If a party attaches an authentic arbitration agreement to a Motion to Compel arbitration, the Court must apply the Rule 12(b)(6) standard unless the plaintiff responds to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue." (cleaned up)); *see also Silfee*, 696 F. App'x at 578 ("In his complaint, Silfee alleged that ERG violated Pennsylvania law by paying his wages through a debit card system that imposed various fees.  ERG then submitted the terms and conditions that Silfee received from the payroll vendor along with that card, which included the arbitration issue in this case.  With a concededly authentic arbitration agreement attached to the complaint, the Rule 12(b)(6) standard was appropriate unless Silfee produced 'additional facts sufficient to place the agreement to arbitrate in issue.'"); *Lawson v. City of Philadelphia*, Civil Action No. 18-1912, 2019 WL 934976, at *3 (E.D. Pa. Feb. 25, 2019).

During oral argument, Matthews's counsel argued that her own email questioning the authenticity of the MAA are enough to place the agreement to arbitrate in issue.  (*See* Doc. No. 12-4.)  This is not so.  Matthews's counsel's email is *not* a *factual* assertion that places the existence of the MAA at issue; rather, it simply poses a question.  Matthews did not provide an affidavit stating that she did not receive the MAA or that she did not sign the agreement.  Rather, during oral argument, her counsel merely argued that Matthews *did not recall* whether she signed the MAA.  But the inability of a nonmoving party to recollect whether she signed the agreement is insufficient to trigger additional discovery and the Rule 56 standard in and of itself.  *See, e.g.*, *Juric v. Dick's Sporting Goods, Inc.*, 2:20-CV-00651-MJH, 2020 WL 4450328, at *9

7

(W.D. Pa. Aug. 3, 2020) ("With respect to contractual disputes, federal courts have consistently held that a party's failure to recall a relevant event is insufficient to raise an issue as to the occurrence of the event . . . .  Plaintiffs have only raised the issue of recollection . . . .  In light of the Plaintiffs' positions and declarations provided by Dick's, the Court may decide this challenge on the existing record.  It is apparent from the face of the Complaint and supporting documents that there is no issue of fact whether the Purported Opt-in Arbitration Plaintiffs received and acknowledged receipt of the Arbitration Agreement.").

Because Matthews did not come forward with any factual evidence to put the MAA into issue, the Rule 12(b)(6) standard applies.  *See Deardorff v. Cellular Sales of Knoxville*, Civil Action No. 19-2642, 2022 WL 407396, at *4 (E.D. Pa. Feb. 9, 2022) (applying Rule 12(b)(6) standard where the plaintiffs "offer[ed] *no* facts to support their contention that Deardorff and Chapman did not actually execute the [arbitration agreements]" and noting that "nowhere do Plaintiffs point to declarations or affidavits where Deardorff and Chapman submit that they never received and/or signed the DCAs, nor do they provide any other evidence"); *Joaquin v. Directv Grp. Holdings, Inc.*, Civil Action No. 15-8194(MAS)(DEA), 2016 WL 4547150, at *3 (D.N.J. Aug. 30, 2016) ("Plaintiff has not stated specific facts sufficient to put the agreements to arbitrate at issue.  Specifically, Plaintiff has not produced any affidavits to support her claim that she did not assent to the arbitration provisions.  Additionally, . . . Plaintiff has not come forward with any evidence in response to Defendants' motion to compel arbitration to trigger the summary judgment standard . . . .  Plaintiff does not unequivocally deny having received the DIRECTV Customer Agreement or Verizon Internet Terms of Service . . . .  Without Plaintiff providing specific facts, or even an unequivocal denial, to call the agreement to arbitrate into issue, the Court does not find that discovery is warranted here.").

"The test in reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6) is whether, under any 'plausible' reading of the pleadings, the plaintiff would be entitled to relief." *Guidotti*, 716 F.3d at 772. "[I]f, accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff, we determine that the plaintiff is not entitled to relief under any reasonable reading of the complaint," then a complaint should be dismissed under Rule 12(b)(6). *Id.*; *see also id.* at 777 ("Under the Rule 12(b)(6) standard, there would be no reading of the complaint, no matter how friendly to [the plaintiff], that could rightly relieve her of the arbitration provision in the Account Agreement[.]").

## III.   Discussion

### A.  *Legal Standard*

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the Act is the enforcement mechanism; it provides that a party "aggrieved" by the "failure" or "refusal of another to arbitrate under a written agreement for arbitration may petition" the court "for an order directing that such arbitration proceed in the manner provided for in [the] agreement." 9 U.S.C. § 4. Once the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," it "shall" order "the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.*; *MZM Constr. Co., Inc. v. N.J. Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 401 (3d Cir. 2020) (explaining that § 4 "mandate[es] that the court be 'satisfied' that an arbitration agreement exists" before directing the parties to proceed to arbitration); *see also Henry Schein, Inc. v.*

*Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." (citing 9 U.S.C. § 2)).  "Because arbitration is a matter of contract, before compelling arbitration pursuant to the [FAA], a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that valid agreement."  *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009); *see also Dicent v. Kaplan Univ.*, 758 F. App'x 311, 313 (3d Cir. 2019).

The FAA "reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'"  *Kirleis*, 560 F.3d at 160 (citation omitted); *see also MZM Constr. Co.*, 974 F.3d at 396 ("The FAA establishes a strong federal policy in favor of compelling arbitration over litigation.").  "But this presumption in favor of arbitration 'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'"  *Kirleis*, 560 F.3d at 160 (citation omitted).  And because the FAA puts arbitration agreements on "equal footing" with other contracts, like contracts, "they may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67–68 (2010) (citations omitted).

### B.  *Matthews's Validity Challenges to the MAA*

Matthews lodges a number of challenges to the MAA.  First, she argues that her electronic signature is not authentic and thus she did not assent to be bound by the MAA.  (Doc. No. 14 at pp. 8–10.)  Second, Matthews contends that the agreement lacks consideration.  (*Id.* at pp. 10–12.)  Third, she asserts that the agreement is procedurally unconscionable because it is a contract of adhesion and substantively unconscionable because its requirement that she maintain confidentiality "grossly favors Defendants."  (*Id.* at pp. 13–15.)  Last, Matthews argues that her

claims do not fall within the scope of the MAA because she initially sought a provisional remedy in the form of a temporary restraining order and preliminary injunction.  (*Id.* at pp. 15–16.)  We address each in turn.

     i.  <u>E-Signature/Assent</u>

  First, Matthews argues that there is reason to question the authenticity of her electronic signature and thus she did not assent to be bound by the MAA.  (Doc. No. 14 at pp. 8–10.) Matthews requests limited discovery on this issue.  (*Id.*)

  To determine whether there is a valid arbitration agreement, courts turn to the relevant state law on the formation of contracts.  *Dicent*, 758 F. App'x at 313; *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002).  "Under Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration."  *Kirleis*, 560 F.3d at 160; *see also Blair*, 283 F.3d at 603.  "In the employment context, arbitration agreements will be upheld when they are specific enough (i.e., unambiguous) to cover the employee's claims and the employee has expressly agreed to abide by the terms of the agreement."  *Kirleis*, 560 F.3d at 160–61 (cleaned up).  Pennsylvania recognizes e-signatures "as a valid means to register legal assent."  *Dicent*, 758 F. App'x at 313; *see also* 73 P.S. § 2260.305 ("An electronic record or electronic signature is attributable to a person if it was the act of a person.  The act of a person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.").

  In arguing that she did not assent to the contract, Matthews relies exclusively on an email exchange between her counsel and counsel for Gucci, in which her counsel states, "My client has reason to question the authenticity of that electronic signature," and then asks for further

evidence of authentication.  (Doc. No. 12-4 at p. 3.)  In response, Gucci's counsel writes, "Gucci maintains that [Matthews's] signature to the document is authentic.  I am familiarizing myself with the technical details and will revert back after I've had the chance to do so."  (*Id.* at p. 2.)  Two days later, Gucci's counsel follows up, "Gucci's records show that Ms. Matthews electronically signed the mutual arbitration agreement in connection with the commencement of her employment.  At the same time Ms. Matthews completed and/or acknowledged 11 other new hire documents, including her W-4 and direct deposit form."  (*Id.*)

Notwithstanding the fact that Defendants provided a sworn declaration setting forth this same evidence, which was attached as an exhibit to their Motion to Compel Arbitration (*see* Doc. No. 12-2 at ¶ 2), in her response brief, Matthews failed to provide *any* evidence to support her contention or to rebut Gucci's sworn statement.[4]  Rather than provide a sworn declaration, Matthews relies on her counsel's conclusory arguments that amount to nothing more than speculation or "blanket assertions."  The Court cannot find that Matthews has plausibly shown that she did not sign the document.  *Contra Kirleis*, 560 F.3d at 161–62 ("Kirleis details the specific circumstances that rendered the formation of an agreement to arbitrate impossible.  For example, she swore under oath that she 'was never provided with a copy of the By-Laws of defendant Firm,' 'never signed any agreement or document which refers to or incorporates the arbitration provision in the By-Laws,' and 'never agreed to arbitrate . . . claims against Firm.'  . .

---

[4] Significantly, Matthews did not submit a declaration or affidavit averring that she did not sign the MAA.  *See Gonder v. Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522, 527 (S.D.N.Y. 2015) ("Dollar Tree attached Gonder's executed arbitration agreement, which clearly carries Gonder's electronic signature.  Nothing in the record (other than Gonder's bald assertion to the contrary in his opposition) suggests this document is anything other than what it appears to be—namely, the executed Agreement between Gonder and Dollar Tree.  Furthermore, Gonder does not allege that he did not sign such an agreement; but that he does not recall signing.  A mere assertion that one does not recall signing a document does not, by itself, create an issue of fact as to whether a signature on a document is valid—especially in the absence of any evidence that the document was fabricated.").

. Kirleis submitted specific, undisputed evidence that she never agreed to arbitrate her claims against the Firm.  The District Court did not err in finding that this evidence creates a genuine dispute of material fact [regarding the existence of an arbitration agreement].”); *Andre v. Dollar Tree Stores, Inc.*, Civil Action No. 18-142-VAC-CJB, 2018 WL 3323825, at *8 (D. Del. July 6, 2018) (“In [her] affidavit, Plaintiff states that she ‘did not look at or review’ the Arbitration Agreement and any opt-out form, and posits that instead another store employee ‘who had access to the Manager’s office’ could have done so while using Plaintiff’s identifying information.  But Plaintiff does not only make this bare allegation—she also provides some specific facts to support this theory.  For example, it is undisputed that one piece of identifying information that was needed to access the DTS arbitration website was an employee ‘pin number’ or ‘password number.’  Plaintiff explains in her affidavit that . . . employee password numbers were kept ‘in a black book . . . in the manager’s office’ so anyone ‘who had access to the Manager’s office also had access to the black book containing [these] password numbers . . . .  Moreover, Plaintiff also provides additional facts that help show that this ‘somebody else logged in instead of me’ scenario has precedent.’”).

Matthews’s blanket assertions that she is unsure whether her signature is authentic and does not recall whether she signed the MAA are insufficient to raise an issue of fact to warrant limited discovery into the existence of the MAA or to deny Defendants’ motion to compel.  *See Juric*, 2020 WL 4450328, at *10 (“In circumstances such as this one, where plaintiffs denied agreeing to arbitration but electronic records proved otherwise, courts have rejected those challenges as a basis to deny contract formation . . . .  Plaintiffs do not refute the methods utilized by Dick’s in its recordkeeping practices or the process by which the PeopleSoft system operates.  Plaintiffs only offer their blanket denials.  Such are insufficient to create a genuine

issue of fact to warrant further discovery or to deny Dick's Motion to Compel."); *Keller v. Pfizer, Inc.*, Civil No. 1:17-CV-1883, 2018 WL 5841865, at *4 (M.D. Pa. Nov. 8, 2018) ("If Plaintiff's logic were sufficient to defeat evidence of a contractual agreement, any party could escape enforcement simply by stating that they forgot the terms of a contract or could not recall signing the document.  Defendant has offered tangible evidence that shows that Plaintiff received, read, and affirmatively agreed to the company's standard arbitration agreement, and Plaintiff has offered no evidence that would invalidate or contradict Defendant's evidence."). *Contra Andre*, 2018 WL 3323825, at *7–8 (permitting "limited discovery relating to the subject to how Plaintiff's identifying information was used to acknowledge access to materials on Defendant's arbitration website (including the Arbitration Agreement and opt-out forms)" where the plaintiff had already submitted an affidavit presenting "specific factual assertions that call[ed] into question whether there was an agreement to arbitrate").

Notably, Matthews never alleges that she did not receive the MAA.  Because it is undisputed that Matthews received the MAA, even if she did not sign it, she would be bound by its terms since she did not follow the opt-out process.  (*See* Doc. No. 12-3 at p. 2 ("Please note that if you fail to opt-out of the MAA as provided above, you will automatically be bound by the MAA."); *id.* at ¶ 10 ("If Employee does not send the signed [Opt-Out] form within 30 days, and if Employee accepts or continues employment with the Company after that date, he or she shall be deemed to have accepted the terms of this Agreement.").)  Matthews never alleges that she followed the opt-out process or otherwise opted out of the MAA.[5]  (*See generally* Doc. No. 14.)

---

[5] Nonetheless, elsewhere in the brief, when arguing that "[t]he parties have not entered into a contract" because it is unclear that she signed the agreement (*see* Doc. No. 14 at pp. 8–10), she does ironically cite to the clear and plain language of the opt-out provision (*see id.* at pp. 10–11 ("The plain language of the Arbitration Agreement does not state that continued employment is contingent on the signing of the Arbitration Agreement.  Rather, the agreement expressly and unambiguously states that Plaintiff can 'opt

Because Matthews did not follow the opt-out process and began working for Gucci after receiving the MAA, the Court holds that she is bound by its terms.  *See Rittenhouse v. GlaxoSmithKline*, Civil Action No. 21-1836, 2021 WL 6197361, at *4 (E.D. Pa. Dec. 30, 2021) ("An employee's failure to opt-out of a voluntary arbitration program constitutes acceptance, especially where failure to opt-out is the exact form of acceptance invited by the offer . . .  Here, GSK told Rittenhouse several times that if she did not take steps to opt out of the program, her inaction would be construed as an agreement to arbitrate her future claims.  Despite these warnings, Rittenhouse did not opt out of the arbitration agreement, and is thus now bound to its terms."); *Stephenson v. AT&T Servs., Inc.*, Civil Action No. 21-0709, 2021 WL 3603322, at *6 (E.D. Pa. Aug. 13, 2021) ("Here, Plaintiff manifested his intent to be bound by the terms of the Arbitration Agreement by not opting out within the sixty-eight-day period between December 3, 2011 and February 6, 2012, after being given three notices to do so if he wished to not be bound. In light of this failure to opt out, this Court finds that Plaintiff accepted Defendant's offer to enter into the Arbitration Agreement."); *Bracy v. Macy's Retail Holdings, Inc.*, Civil Action No. 19-3825, 2020 WL 1953647, at *7 (E.D. Pa. Apr. 23, 2020) ("Here, Plaintiff manifested her intent to be bound by the terms of the Arbitration Program by not returning the opt-out election form on two separate occasions and by continuing to work for Defendants.").

      ii.   <u>Consideration</u>

Next, Matthews contends that the MAA is invalid because it lacked consideration.

For a contract to be valid under Pennsylvania law, there must be consideration.  *Kirleis*, 560 F.3d at 160.  "Consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange

---

out of the Arbitration Agreement pursuant to the opt-out process.'" (cleaned up)).)

for the original promise." *Blair*, 283 F.3d at 603 (cleaned up).  "Without consideration, a contract is unenforceable."  *Id.*

Where, as here, "both parties have agreed to be bound by arbitration, adequate consideration exists and the arbitration agreement should be enforced."  *Blair*, 283 F.3d at 603; *see also Stephenson*, 2021 WL 3603322, at *7 ("Furthermore, mutual promises to arbitrate constitute sufficient consideration.  Here, the Arbitration Agreement mutually obliges Plaintiff and Defendant to arbitrate disputes between one another.  [This] . . . form[] of consideration support[s] the Arbitration Agreement at issue."); *Smeck v. Comcast Cable Commc'ns Mgmt., LLC*, Case No. 19-cv-3625-JMY, 2020 WL 6940011, at *5 (E.D. Pa. Nov. 25, 2020) ("The agreement to use the Comcast Solutions dispute resolution program is clearly supported by consideration.  In this instance, both Comcast and Plaintiff agreed to resolve employment related disputes through the Comcast Solutions program.  The Comcast Solutions Brochure states, 'By accepting employment with Comcast you are agreeing that you and the company will be bound by the Comcast Solutions program.'  These mutual promises to submit claims to dispute resolution in and of themselves are sufficient consideration to support the agreement to use Comcast Solutions."); *Mason v. Lowe's Co.*, Civil Action No. 19-973, 2020 WL 3574313, at *2–3 (W.D. Pa. June 30, 2020) (rejecting the plaintiff's argument that adequate consideration did not exist because "[t]he language of the Arbitration Agreement is 'clear that both parties agreed to be bound to the arbitration agreement'" (cleaned up)); *Rivera v. PetSmart, Inc.*, Civil Action No. 18-2121, 2018 WL 5045380, at *4 (E.D. Pa. Oct. 17, 2018) (concluding that the plaintiff's argument that the arbitration agreement was invalid for lack of consideration "falls short" since she agreed to arbitrate covered claims); *Dimattei v. Diskin Motors, Inc.*, Civil Action No. 16-5183, 2017 WL 1283943, at *4 (E.D. Pa. Apr. 6, 2017) ("Here, both parties are plainly bound by

the text of the agreement to submit to arbitration: 'Employer and Employee therefore mutually agree that any Dispute between them (including any dispute involving an employee or agent of Employer) shall be submitted to binding arbitration.'  Consequently, adequate consideration exists.").

The MAA clearly states that "Employee and the Company both agree all legal disputes and claims between them . . . shall be determined exclusively by final and binding arbitration." (Doc. No. 12-3 at ¶ 1.)  Accordingly, the Court finds that the MAA has adequate consideration.

Trying to escape this conclusion, Matthews sets forth a convoluted, unsupported argument that has no bearing on, or relevance to, the facts of this case.  She argues that her employment with Gucci commenced when she received her offer letter on March 11, 2019 and that accordingly, when she signed the MAA on March 24, 2019, the agreement to arbitrate arose in the post-employment context.  (Doc. No. 14 at pp. 10–12.)  Citing to a Pennsylvania Supreme Court decision that arose in an entirely different context, Matthews extrapolates that because she signed the MAA after her offer letter, but before she began her first day of work at Gucci, additional consideration was required "beyond mere continued employment."  (*Id.*)

There are several issues with this argument.  First, as illustrated by the voluminous body of case law cited above, it is well established that a mutual agreement to arbitrate is adequate consideration in and of itself.[6]  Second, Matthews fails to cite any case law or record evidence for the proposition that employment begins upon receipt, or acceptance, of an offer letter.  The very terms of Matthews's offer letter undermine this position (*see* Doc. No. 14-1 (stating that Matthew's "offer is contingent upon the successful completion of [her] background check and/or

---

[6] The Court notes that Matthews failed to address, or even acknowledge, *Blair* and the principle that adequate consideration exists where there is a mutuality of obligation, e.g., where both parties have agreed to be bound by arbitration.  (See Doc. No. 14 at pp. 10–12.)

any reference check" and setting forth an "anticipate[d]" "start date" of April 1, 2019)), as does her Complaint (*see* Doc. No. 1 at ¶ 24 ("Around April 2019, Plaintiff was hired as a Connection Coordinator by Defendant Gucci.")).  Third, the main case on which Matthews relies, *Bilec v. Auburn & Associates, Inc. Pension Trust*, 588 A.2d 538 (Pa. Super. Ct. 1991), is inapposite.  It involved a non-competition clause—not an arbitration clause, and the appellants had been working for their employer for nearly a decade before their employer unilaterally amended their employment contracts to include a non-competition clause, which amounted to a change in the conditions of their employment.  That is a far cry from what occurred here.

Fourth, even assuming *arguendo* that Matthews's employment with Gucci began when she received the offer letter, there is case law *within this District* refuting Matthews's exact argument that continued employment is not adequate consideration.  In *Alexander v. Raymours Furniture Co.*, the plaintiff "contest[ed] . . . the consideration element of contract formation, arguing his continued employment by Raymour alone [was] insufficient consideration for the forfeiture of his constitutional right to a jury trial," and he relied on *Bilec* to support his position, "argu[ing] [that] the same rule should apply to post-hiring arbitration agreements."  Civil Action No. 13-5387, 2014 WL 3952944, at *5 (E.D. Pa. Aug. 13, 2014).  The court disagreed, explaining that "the weight of authority" ran counter to the plaintiff's position.  *Id.*  ("Numerous courts in this district have held 'continued employment fulfills the consideration requirement [for an arbitration agreement] under Pennsylvania law.'" (citation omitted); *see also id.* ("[A]t least one federal court of appeals has rejected the same analogy [the plaintiff] attempts to draw to the law of noncompetition agreements, noting the motivations for restricting noncompetition agreements 'are not necessarily applicable to arbitration agreements'" (citation omitted)).  The court also noted that "under Pennsylvania law, the requirement that a post-employment

restrictive covenant be supported by new consideration is an exception to the general rule that the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms, which the employee accepts by continuing to perform the duties of his or her job; no additional or special consideration is required" and found that "the cases holding an employee's continued employment is adequate consideration for a post-employment arbitration agreement are consistent with this general rule." *Id.* (cleaned up). Ultimately, the court held that the agreement to arbitrate was supported by adequate consideration (i.e., continued employment). *Id.*; *see also Stephenson*, 2021 WL 3603322, at *7 ("Under Pennsylvania law, continued employment after receiving notice of an arbitration policy is sufficient to establish acceptance of, as well as consideration for, an arbitration agreement.  It is undisputed that Plaintiff continued to work for Defendant after receiving the Arbitration Agreement, which alone constitutes valid consideration for the Arbitration Agreement.").

    For these reasons, Matthews's contention that the MAA lacks consideration holds no water.

                    iii.    Unconscionability

    Matthews contends that the MAA is unconscionable.  "Under Pennsylvania law, the party challenging an arbitration agreement bears the burden of showing that the arbitration agreement is both procedurally and substantively unconscionable." *Richards v. Am. Academic Health Sys., LLC*, Civil Action No. 2:20-cv-00059-KSM, 2020 WL 2615688, at *6 (E.D. Pa. May 22, 2020) (citing *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 230 (3d Cir. 2008); *Quilloin v. Tenet HealthSys. Phila.*, *Inc.*, 673 F.3d 221, 230 (3d Cir. 2012)).

    Procedural unconscionability focuses on the process by which the parties entered into the agreement.  *See Richards*, 2020 WL 2615688, at *6.  The Pennsylvania Supreme Court has

defined procedural unconscionability as the "absence of meaningful choice on the part of one of the parties." *Witmer v. Exxon Corp.*, 434 A.3d 1222, 1228 (Pa. 1981). A contract is generally found to be procedurally unconscionable if it is a contract of adhesion. *Quilloin*, 673 F.3d at 235; *Hopkins v. New Day Fin.*, 643 F. Supp. 2d 704, 717 (E.D. Pa. 2009). A contract of adhesion is a "a contract prepared by a party with excessive bargaining power and presented to the other party on a 'take it or leave it' basis." *Hopkins*, 643 F. Supp. 2d at 717. However, "unequal bargaining power" alone is insufficient to render an arbitration agreement a contract of adhesion. *See Brennan v. CIGNA Corp.*, 282 F. App'x 132, 136 (3d Cir. 2008) ("More than a disparity in bargaining power is needed to show that an arbitration agreement between an employer and its employee was not entered into willingly."); *see also Quilloin*, 673 F.3d at 235 ("[C]ontracts cannot be deemed unconscionable 'simply because of a disparity in bargaining power.'" (quoting *Witmer*, 434 A.2d at 1228)). Rather, to establish that a contract is in fact a contract of adhesion, "a party must establish both a lack of meaningful choice about whether to accept the provision *and* that the disputed provisions are so one-sided as to be oppressive." *Brennan*, 282 F. App'x at 136.

Here, Matthews baldly asserts, in an entirely conclusory fashion, that the MAA is a contract of adhesion. (Doc. No. 14 at p. 16.) Matthews is wrong. By its very terms, the MAA afforded Matthews the opportunity to opt out of the agreement; her employment with Gucci was not conditioned on her signing the MAA. (Doc. No. 12-3 at ¶ 10.) Because she had the ability to opt out of the MAA, Matthews cannot turn around and argue that she lacked a "meaningful choice" about whether to accept the terms of the agreement. Accordingly, this Court finds that the MAA was not a contract of adhesion. *See, e.g.*, *Stephenson*, 2021 WL 3603322, at *7 ("Because the Arbitration Agreement contained an opt-out provision, it was not presented to

Plaintiff on a take-it-or-leave-it basis and, therefore, is not an adhesion contract."); *Broomall Operating Co. v. Eldridge*, Civil Action No. 20-2168, 2021 WL 3910723, at \*8 (E.D. Pa. Aug. 31, 2021) ("Critically, the DRP Agreement was voluntary and not a condition of Mr[s]. Eldridge's admission to the Facility . . . .  Here, Mrs. Eldridge was not deprived of a meaningful choice regarding her options to elect or decline to participate in DRP.  As such, the DRP Agreement is not a contract of adhesion and, therefore, is not procedurally unconscionable."); *Black v. JP Morgan Chase & Co.*, Civil Action No. 10-848, 2011 WL 3940236, at \*18 (W.D. Pa. Aug. 25, 2011) ("Plaintiff was given an opt-out right and she failed to execute it.  In these circumstances, the Court cannot conclude that Plaintiff lacked a meaningful choice as to the terms of the Cardholder Agreement.").[7]

Because Matthews must establish that the MAA is *both* procedurally and substantively unconscionable, we need not consider Matthews's argument that the MAA is substantively unconscionable because it includes a confidentiality provision.[8]  *See Richards*, 2020 WL 2615688, at \*8; *see also Zimmer*, 525 F.3d at 230; *Broomall Operating Co.*, 2021 WL 3910723,

---

[7] Further, Matthews fails to offer *any* support for her contention that the MAA is a contract of adhesion. Indeed, her entire analysis on procedural unconscionability consists of *a single sentence*.  (*See* Doc. No. 14 at p. 13 ("The Arbitration Provision in this case was a contract of adhesion, drafted by Defendants and is therefore procedurally unconscionable.").)  This alone shows that she has failed to meet *her* burden of establishing procedural unconscionability.  *See Rivera v. PetSmart, Inc.*, Civil Action No. 18-2121, 2018 WL 5045380, at \*3 (E.D. Pa. Oct. 17, 2018) ("Plaintiff contends that the Agreement is a contract of adhesion, but does not allege any facts in support.  As Plaintiff has failed to explain why the Agreement is an unenforceable adhesion contract, Plaintiff has not met her burden of demonstrating that the agreement is procedurally unconscionable.").

[8] During oral argument, Plaintiff's counsel mentioned the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, which the House passed on February 7, 2022 and passed the Senate on February 10, 2022, but the President has yet to sign.  Counsel argued that the Act supports her argument that confidentiality provisions in arbitration agreements are substantively unconscionable in sexual harassment cases.  However, counsel for both parties agree that the Act does not apply here since this case arose before its enactment.  (*See* H.R. 4445, 117th Congress, 2d Session (Sec. 3.  Applicability: This Act . . . shall apply with respect to any dispute or claim that arises or accrues *on or after* the date of enactment of this Act.").)

at *8.

           iv.    <u>Scope of the MAA</u>

Last, Matthews argues that her claims do not fall within the scope of the MAA.  (Doc.

No. 14 at pp. 15–16.)

To determine whether Matthews's claims fall within the scope of the MAA, we apply

ordinary principles of contract interpretation.  *See Russell v. Chesapeake Appalachia, L.L.C.*, No.

4:14-cv-00148, 2014 WL 6634892, at *6 (M.D. Pa. Nov. 21, 2014) ("Because arbitration is

strictly a matter of contract, arbitration agreements are subject to the principles of contract

interpretation.").  "The fundamental rule in contract interpretation is to ascertain the intent of the

contracting parties.  In cases of a written contract, the intent of the parties is the writing itself."

*Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 123 (Pa. 2011) (cleaned up).  In

Pennsylvania, "in determining the intent of the contracting parties, all provisions in the

agreement will be construed together and each will be given effect."  *Id.* (cleaned up).  This

means that courts should "not interpret one provision of a contract in a manner which results in

another portion being annulled."  *Id.* (cleaned up); *see also Lawson v. City of Philadelphia*, Civil

Action No. 18-1912, 2019 WL 934976, at *6 (E.D. Pa. Feb. 25, 2019) ("As a general principle, a

contract should be read as a whole and no provision should be interpreted to be meaningless.");

*Comm'cns Workers of Am., AFL-CIO v. Verizon Servs. Corp., Dist. 13*, Civil Action No. 10-

6840, 2011 WL 3438193, at *4 (E.D. Pa. Aug. 5, 2011) ("Plaintiff's interpretation of these two

sections of the agreement would put them at odds with one another, and render the bargaining

agreement meaningless.  However, in making a determination concerning the clarity or

ambiguity of a contract term, the Court should avoid interpreting contractual language in a way

that renders any term of the contract meaningless or superfluous.  In order to avoid applying a

meaning that would render a portion of the contract superfluous, the Court finds that each of the two aforementioned quotations deal with separate issues.").

Matthews's entire argument hinges on the fact that she filed a motion for a temporary restraining order and a preliminary injunction at the outset of this case (which she withdrew shortly thereafter), and the MAA excludes "legal disputes and actions" in which a party "seek[s] a provisional remedy in any court of competent jurisdiction." (*Id.*; *see also* Doc. No. 12-3 at ¶ 2.) Matthews's position is unsupported and nonsensical. Paragraph 3 of the MAA states, "[B]y agreeing to submit the described claims to binding arbitration, Employee . . . knowingly and voluntarily waive[s] the right to file, or participate or obtain relief in, a court action of any nature seeking money damages or injunctive relief against the Company, except as described above." (Doc. No. 12-3 at ¶ 3.) In turn, Paragraph 2 excludes from the MAA "an action by either party seeking a provisional remedy in any court of competent jurisdiction," among other things. (*Id.* at ¶ 2(e).) By asking us to find that her claims fall within this "provisional remedy" exclusion solely because she initially filed a motion for a temporary restraining order and a preliminary injunction, Matthews asks us to read exclusion (e) of Paragraph 2 in isolation and out of context. Paragraph 3 of the MAA could not be clearer: an employee *cannot* file a court action seeking money damages or *injunctive relief*, where, as here, she agrees to be bound by the MAA. If the "provisional remedy" exclusion within Paragraph 2 applied whenever an employee had, at one point in time, sought preliminary injunctive relief, Paragraph 3 would be rendered meaningless. Employees would be incentivized to file meritless motions for injunctive relief to circumvent the MAA's mandate that they arbitrate their claims.

In any event, Matthews withdrew her motion for a temporary restraining order and preliminary injunction shortly after a conference call with the Court, and she fails to explain how

a *withdrawn* motion can serve as the basis for this exception, as she is no longer seeking relief.  (*See* Doc. No. 12-2 at ¶ 2 ("The only legal disputes and actions excluded from this Agreement are . . . (e) an action by either party *seeking* a provisional remedy in any court of competent jurisdiction." (emphasis added)).)

Matthews essentially argues that because she, at one point in time, sought injunctive relief against Gucci, this "provisional remedy" exclusion applies to *all* her claims against Gucci, *forever*—even if those claims are untethered from the provisional relief she originally sought. Carrying out this same logic as to exclusion (c)—a separate exclusion within Paragraph 2— underscores the absurdity of her argument.  It states that "actions to enforce this Agreement [or to] compel arbitration" are "excluded from this Agreement."  (Doc. No. 12-2 at ¶ 2 ("The only legal disputes and actions excluded from this Agreement are . . . (c) actions to enforce this Agreement, compel arbitration, or enforce or vacate an arbitrator's award under this Agreement.").)  Applying the logic above to this exclusion, by moving to compel arbitration in this action (or, in the alternative, if it were to bring a separate action against Matthews to enforce the MAA), Gucci, in effect, waives the right to arbitrate its claims because the exclusion applies not only to that proceeding or motion, but to everything that comes after.  This makes no sense.

This Court finds that Matthews's claims fall within the scope of the MAA.  Pursuant to the MAA, Matthews and Gucci "agree[d] all legal disputes and claims between them, including without limitation *those relating to Employee's employment with the Company* . . . shall be determined by final and binding arbitration."  (Doc. No. 12-3 at ¶ 1 (emphasis added).) Undoubtedly, based on the clear language of the MAA, Matthews's discrimination, retaliation, hostile work environment, ADA, and FMLA claims relate to her employment with Gucci and fall

within the MAA's scope.[9]

## IV.   Sanctions

Defendants argue that this Court should impose sanctions on Matthews's counsel pursuant to 28 U.S.C. § 1927.  (Doc. No. 12 at pp. 16–17; Doc. No. 14 at pp. 13–14.)  Under 28 U.S.C. § 1927, a court may require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The Third Circuit has instructed that sanctions under Section 1927 are limited and may only be imposed when an attorney has "(1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct."  *LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC*, 287 F.3d 279, 288 (3d Cir. 2002); *see also In re Prosser*, 777 F.3d 154, 162 (3d Cir. 2015).

The Third Circuit has emphasized that courts should not exercise this sanctioning power lightly.  *See LaSalle Nat'l Bank*, 287 F.3d at 288 ("Although § 1927 provides a court with a mechanism for sanctioning vexatious and willful conduct, 'courts should exercise [this sanctioning power] only in instances of a serious and studied disregard for the orderly process of justice.'" (citations omitted)).  Because "[t]he power to sanction under § 1927 necessarily carries with it the potential for abuse," courts are to construe the statute "narrowly and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the

---

[9] Notably, Matthews fails to actually make *any* argument in her opposition that her employment discrimination and retaliation claims fall outside the scope of the MAA; rather, she attempts to bypass the clear language of the MAA by focusing exclusively on the "provisional remedy" exclusion and the fact that her withdrawn preliminary injunction motion requested provisional relief.  (*See* Doc. No. 14 at pp. 15–16 ("As the [preliminary injunction] Motion was not brought in bad faith and the MAA carves out an exception for when either part [sic] seeks a provisional remedy, this Honorable Court should find the MAA unenforceable in the instant action.").)

law." *Id.* at 289 (cleaned up); *see also FS2 Cap. Partners, LLC v. Church*, Civil Action No. 14-4933, 2015 WL 4522868, at *4 (E.D. Pa. July 27, 2015) ("A 'high standard' guards the imposition of sanctions pursuant to § 1927 to insure [sic] 'that the provision in no way will dampen the legitimate zeal of an attorney in representing his client.'  In this case, Defendant has failed to meet this heavy burden." (citations omitted)).

Accordingly, we may not impose sanctions under Section 1927 "absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal." *LaSalle Nat'l Bank*, 287 F.3d at 289 (noting that "the bad faith requirement is necessary for a finding of liability, otherwise 'an attorney who might be guilty of no more than a mistake in professional judgment in pursuing a client's goals might be made liable for excess attorneys' fees'" (citation omitted)); *see also Hawthorne v. Municipality of Norristown*, Civil Action No. 15-01572, 2016 WL 1720501, at *2 (E.D. Pa. Apr. 29, 2016) ("The attorney's conduct 'must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation.'" (citation omitted)).

Although admittedly a close call,[10] the Court finds that Matthews's counsel's arguments reflect a misunderstanding of the law and mistakes in professional judgment as opposed to

---

[10] Notwithstanding this ruling, the Court finds Plaintiff's counsel's course of conduct in this litigation very troubling.  For example, Plaintiff's counsel represented during a meet and confer that a court decision supported her position that the MAA was invalid but failed to provide any citation, the name of the case, or the issuing court.  (See Doc. No. 12-2 at ¶ 10.)  Further, she failed to respond to Defendants' counsel's multiple communications asking for the material.  (*Id.* at ¶¶ 11–14; Doc. Nos. 12-9, 12-10.)  In addition, although Plaintiff's counsel filed a certificate of service in connection with Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. 2 at p. 18), Defendants' counsel asserted that he never received the motion (Doc. No. 12-8 at p. 4), Plaintiff's counsel never answered the Court's question directly asking her, via email, whether she emailed Defendants' counsel the motion (Doc. No. 12-8 at pp. 2–3), and Plaintiff's counsel admitted during the February 3, 2021 conference that she had not sent the motion to Defendants' counsel.  Although the Court does not issue sanctions against Plaintiff's counsel at this time, Plaintiff's counsel is advised that in the future she must conduct herself with professionalism, act in good faith during meet and confers, and respond fully to the Court—and opposing counsel's—inquiries.

willful bad faith, and that Defendants have failed to meet their heavy burden of showing that Section 1927 sanctions are warranted.

## V.    Conclusion

For the foregoing reasons, the Court grants Defendants' Motion to Compel Arbitration. Because neither party has not requested a stay pending arbitration pursuant to 9 U.S.C. § 3, the Court dismisses this action.

An appropriate Order follows.